# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE WESTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| LORIE LYNN BOATRIGHT, | ) | Case No. 08-30442 |
| | ) | |
| Debtor. | ) | |

## MEMORANDUM OPINION

This case presents an issue over which bankruptcy courts are divided, and that is: To what extent should a non-debtor spouse's income be considered in determining whether a debtor's bankruptcy filing is abusive?

Courts widely agree that a non-debtor spouse's income should be considered in determining whether a debtor's bankruptcy filing should be dismissed as abusive under 11 U.S.C. § 707(b). They are not in agreement, however, on the extent to which the non-debtor spouse's income should be considered in making that determination. Some courts simply combine the debtor's and the non-debtor spouse's income, without regard to how they actually share (or do not share) income and divide expenses; others consider the particulars of each case.

In the case before the Court, the outcome of the United States Trustee's motion to dismiss pursuant to § 707(b)(2) and (b)(3) hinges on which approach the Court adopts. The Debtor, Lorie Lynn Boatright, makes about $29,000 a year. The Debtor's husband, Aaron Todd Boatright, who did not join in the Debtor's bankruptcy petition, has an income of approximately $180,000 a year. If the Debtor's and Mr. Boatright's incomes are combined, as the United States Trustee argues they should be, dismissal of the Debtor's case would be warranted under § 707(b)(2) or (3). However, if only the amount of Mr. Boatright's income from which the Debtor actually derives any benefit is considered, dismissal would not be warranted under either provision.

## BACKGROUND

Lorie Boatright filed for protection under Chapter 7 of the Bankruptcy Code on May 30, 2008. On September 30, 2008, the United States Trustee ("UST") filed a motion under 11 U.S.C. § 707(b)(2) and (b)(3) to dismiss the Debtor's bankruptcy case as an abuse of Chapter 7 of the Bankruptcy Code. The UST filed an amended motion to dismiss on March 10, 2009. On July 23,

1

2009, the Court held a hearing on the UST's amended motion to dismiss and took the matter under advisement.

Interestingly, the key facts in this matter are not in significant dispute, although their interpretation and the application of the law to those facts are.

With regard to the Debtor's "direct" income, *i.e.*, the Debtor's earnings, differences between the parties' positions are trivial. The Debtor is employed at Queen City Air Freight ("Queen City"), a company wholly owned and controlled by her husband. The Debtor reports that her monthly gross wages are $2,437.85 and that her monthly net wages are $1,939.34. The UST alleges that her gross income is slightly higher – $2,607.08 – but that her net income is slightly lower – $1,823.19.

With regard to Mr. Boatright's income, there is a great discrepancy between the income reported on the Debtor's bankruptcy schedules (and Official Form 22A) and the significantly higher income the UST maintains Mr. Boatright earns, but at the hearing, neither the Debtor nor Mr. Boatright offered much, if any, evidence disputing the UST's evidence of Mr. Boatright's higher income.[1] According to the Debtor's schedules, Mr. Boatright's gross monthly income is $6,933.34, based solely on his salary from Queen City. The UST, on the other hand, estimates that Mr. Boatright's monthly income is approximately $16,245.03, made up of a monthly gross salary of $7,451.03 and distributions from Queen City of $15,038.17, minus $6,244.17 in losses from Mr. Boatright's rap music venture (discussed below).

On the expense side, Mr. and Mrs. Boatright have a somewhat unique approach to dividing the responsibilities for household expenses. At least, *Mr. Boatright* has a unique approach to managing the household finances; it was clear from the Debtor's and Mr. Boatright's testimony that the Debtor has little say, if any, on how the household expenses are divided – Mr. Boatright pays the mortgage and utility payments, and the Debtor is responsible for the rest of the household expenses, including food for the family, clothing, and medical expenses for herself and their two children. The Debtor testified that the majority of her approximately $70,000 of unsecured debt was incurred to pay household expenses.

---

[1] Counsel for the Debtor challenged the UST's methodology for calculating the income distributions Mr. Boatright received from Queen City in the relevant periods, but, as discussed below, the actual amount of Mr. Boatright's income beyond what he contributes to the household budget is largely irrelevant.

The UST has not challenged that this is, in fact, the division of expenses between the Debtor and Mr. Boatright. Nor has the UST objected to any particular expense as being extravagant or unwarranted, other than an expense claimed on the Debtor's Schedule J for a $195.80 payment on Mr. Boatright's motorcycle and a $1,059.26 payment for a Cadillac Escalade driven by Mr. Boatright's "business partner," Samuel Guiltner, a rap music artist who calls himself "Solow 13" – which brings us to the topic of what Mr. Boatright does with the income he does not devote toward the support of his family.

Mr. Boatright testified, and the documentary evidence supports, that Mr. Boatright devotes most of his income – aside from paying the household mortgage and utility payments – toward the "investment" in and promotion of Solow 13 and their rap music enterprise. Tax returns for the partnership formed by Mr. Boatright and Solow 13, "Truth Loves La WFamillia, LLC," indicate that Mr. Boatright invested $87,426 in 2007 and $54,193 in 2008, but that the partnership lost more than that in those combined periods ($83,059 in 2007 and $74,930 in 2008). By agreement, Mr. Boatright claims all of the losses on his tax returns. In addition to his income and distributions from Queen City, Mr. Boatright testified that he has borrowed $130,000 from family members to invest in his rap music venture. Mr. Boatright testified that the partnership has never turned a profit.

The divergent views of the Debtor's financial picture can be summarized as follows:

On Official Form 22A, the Debtor states that she has no disposable income or, more precisely, that she has a monthly deficit of $316.69. She arrives at this figure by deducting $4,213.87 in expenses from an income of $3,897.18. The Debtor calculated her income by adding her gross monthly salary of $2,416.69 to Mr. Boatright's (alleged) gross monthly salary of $6,933.34, and then subtracting $5,452.85 as a "marital adjustment" as provided for on Line 17 of Form 22A. Line 17 instructs a debtor to specify the amount of and specific expenses for which a non-debtor's income included above is "NOT paid on a regular basis for the household expenses of the debtor or the debtor's dependents."[2]

In contrast, the UST maintains that the Debtor has $3,172.01 in disposable income. Notably, the UST does not object to or otherwise challenge the marital adjustment or the expense deductions claimed; the only germane objection – and thus the primary source of the discrepancy – is to the

---

[2] Emphasis in original.

3

amount of Mr. Boatright's income.[3]  The UST asserts that Mr. Boatright's income is $11,762.40, $4,829 higher than the Debtor alleges.

On Schedule J, the Debtor states that she has $8.49 in disposable income, based on essentially the same figures she uses on Form 22A.  The UST, on the other hand, asserts that the Debtor has $6,892.73 in disposable income.  The discrepancy between these figures again arises primarily from the UST's attribution of a significantly higher income to Mr. Boatright – $16,245.03 versus the $6,933.34 figure advanced by the Debtor – and the disallowance of certain expenses apparently attributable solely to Mr. Boatright, including the $1,059.26 payment on the car driven by Solow 13 and payments on Mr. Boatright's motorcycle, credit cards, and a debt simply listed as "loan."

## DISCUSSION

Prior to the enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), a court could dismiss a case under § 707(b) if "the granting of relief (*i.e.*, a discharge) would be a substantial abuse of the provisions of this chapter."[4]  The inquiry under this provision encompassed the totality of circumstances, but most cases hinged on whether a debtor had the ability to make a "substantial effort to repay his or her debts."[5]

With the enactment of BAPCPA, the theretofore ad hoc totality of circumstances analysis was codified in § 707(b)(3).  Despite the ostensible breadth of the analysis, though, the case law continues to be predominated by an examination of a debtor's ability to repay a significant portion of unsecured debt.  Section 707(b)(3) does, however, provide a court with greater flexibility to ascertain a debtor's true current financial condition, in contrast to the fairly rigid formula employed by amended § 707(b)(2).

---

[3] The UST made several other adjustments based on the Debtor's and Mr. Boatright's likely tax liability resulting from Mr. Boatright's upward-adjusted income.

[4] 11 U.S.C. § 707(b) (West 2004).

[5] There was no bright line test as to how much or what percentage of unsecured debt should be repaid to constitute a "substantial effort." *In re McLaughlin*, 305 B.R. 505, 508 (Bankr. W.D. Mo. 2004).  *See e.g.*, *Nelson v. Siouxland Fed. Credit Union* (*In re Nelson*), 223 B.R. 349, 353 (B.A.P. 8th Cir. 1998) (79.9% in three years); *In re Smith*, 269 B.R. 686, 692 (Bankr. W.D. Mo.2001) (26% in three years, and 44% after five years).

Under § 707(b)(2) a rebuttable presumption that a case is abusive, *i.e.*, that a debtor can fund a Chapter 13 plan, arises when the debtor's "projected disposable income" exceeds the thresholds set out in § 707(b)(2)(A)(I).[6] Projected disposable income is determined by subtracting certain expenses, many of which are standardized, from a debtor's "Current Monthly Income," which is calculated according to the parameters set out in 11 U.S.C. § 101(10A).

The central issue in this case is the degree to which a non-debtor spouse's income should be considered in a determination of abuse. Therefore, the resolution of this issue lies in the details of what constitutes "income" under § 101(10A) and § 707(b)(3).

**A.     Treatment of Mr. Boatright's income under § 101(10A).**

Current Monthly Income ("CMI") is defined in § 101(10A) as the "average monthly income from all sources that the debtor receives (or in a joint case the debtor and the debtor's spouse receive) without regard to whether such income is taxable income, derived during the 6-month period (preceding the petition date). . . ."[7] Germanely, § 101(10A)(B) further defines CMI to include "any amount paid by any entity other than the debtor (or in a joint case the debtor and the debtor's spouse) on a regular basis for the household expenses of the debtor or the debtor's dependents (and in a joint case the debtor's spouse if not otherwise a dependent). . . ." Therefore, to fall within the definition of Current Monthly Income, a non-debtor spouse's income must either be subsumed within the phrase "income a debtor receives" or be considered under § 101(10A)(B) as the "amount paid by any entity other than the debtor . . . on a regular basis for the household expenses of the debtor or the debtor's dependents. . . ."

Posed with these two interpretations, the Court finds that a non-debtor spouse's income is better considered under § 101(10A)(B). "[A] court's primary objective is to ascertain the intent of the legislature by looking at the language of the statute itself and giving it its plain, ordinary and

---

[6] The presumption is rebutted by a showing of "special circumstances." 11 U.S.C. § 707(b)(2)(B). Here, the Debtor does not seek to rebut the presumption, and, indeed, she has not offered any evidence of special circumstances. Rather, the Debtor maintains that the presumption simply does not arise in her case.

[7] 11 U.S.C. § 101(10A). The specific directions in § 101(10A)(A)(i) and (ii) for measuring the 6-month period have been omitted as they are not relevant to this case.

commonly understood meaning."[8]  Section 101(10A)(B)'s reference to an "amount paid by any entity other than the debtor . . . on a regular basis for the household expenses of the debtor or the debtor's dependents" provides a ready framework for the consideration of a non-debtor's income, whereas interpreting "income a debtor receives" broadly enough to include the contributions a non-debtor spouse makes for household expenses would unnecessarily strain the language of the statute.

For most couples, the calculation of the amount a non-debtor spouse contributes toward household expenses does not pose a challenge because most couples pool all income and share all expenses.  Although Mr. and Mrs. Boatright do not fit the mold of "most couples" in the way they handle their household finances, it is not difficult to calculate the amount Mr. Boatright contributes on a regular basis for the household expenses because the uncontroverted evidence shows that the only household expenses he pays on a regular basis are the mortgage and utility payments.  Beyond that, the Debtor is responsible for all of the household expenses.  Therefore, the Debtor's current monthly income for purposes of § 707(b)(2) is $4,198.08 – her salary ($2,416.69) plus the amount Mr. Boatright pays toward the mortgage ($1,272.38) and utilities ($509).[9]

The presumption of abuse does not arise if this figure is plugged into the formula set out in §707(b)(2) and ostensibly reflected on Form B22A.[10]  Under § 707(b)(2), the Debtor is entitled to expense deductions totaling $4,849.26.  These deductions track the unchallenged deductions claimed on Form B22A, with one addition – a $635.39 deduction for the secured debt payment for the home

---

[8] *In re M & S Grading, Inc.*, 457 F.3d 898, 900 (8th Cir. 2006).

[9] In the absence of evidence to the contrary, the Court adopts the estimation of these expenses listed on Schedule J.

[10] Although Form B22A was designed to effectuate the analysis in § 707(b(2), its methodology differs from § 707(b)(2) with regard (*inter alia*) to the consideration of a non-debtor spouse's income.  Where § 707(b)(2), by way of § 101(10A), considers as CMI only those amounts a non-debtor contributes regularly to household expenses, Form B22A starts with an income figure that includes all of a non-debtor spouse's income (for purposes of determining whether the household exceeds the median income), and then provides the debtor an opportunity to deduct on Line 17 all of the amounts "NOT" contributed regularly to household expenses.  If the Court were to revise the Debtor's Form B22A here, the Court would simply deduct on Line 17 all of Mr. Boatright's income except for the amounts paid toward the household mortgage and utilities.  Ultimately, the result doesn't change, but the methodology employed by Form B22A does slightly complicate the evaluation of a non-debtor spouse's income, and, to some degree, saddles a debtor with an evidentiary challenge not imposed by § 101(10A)(B).

mortgage in excess of the standardized housing allowance.[11] The Debtor did not claim this deduction on Form B22A, but she is entitled to it because her CMI includes the full amount Mr. Boatright pays toward the home mortgage. Subtracting the Debtor's permitted expenses from her CMI reveals that, for purposes of § 707(b)(2), the Debtor has a monthly deficit of $651.18, a figure significantly below the threshold for triggering a presumption of abuse under § 707(b)(2).

Accordingly, dismissal is not warranted under § 707(b)(2).

**B.      Treatment of Mr. Boatright's income under § 707(b)(3).**

As noted above, courts widely agree that a non-debtor spouse's income must be considered in determining whether a debtor's bankruptcy filing should be dismissed as abusive under 11 U.S.C. § 707(b)(3),[12] but there is some divergence on the issue of whether the debtor and non-debtor's income and expenses should simply be "lumped," or "pooled," together, or whether a court should look at the manner in which the debtor and non-debtor conduct their household finances and apportion the income and expenses accordingly. As Judge Dow of this district noted in *In re Reeves,* "reasonable arguments can be made in favor of either approach and each is vulnerable to certain objections."[13] Ultimately, Judge Dow declined to choose between these two approaches because he

---

[11] The Debtor lists two different figures for the amount of the mortgage payment: on Form B22A on Line 17, the Debtor indicates that it's $1,295.24, versus $1,272.38 stated on her Schedule J. Although that discrepancy would affect the secured debt expense for the mortgage by approximately $22, that discrepancy is irrelevant, inasmuch as the Debtor's permitted expenses exceed her CMI by over $500.

[12] *See, e.g., In re Harter, 397 B.R. 860 (Bankr. N.D. Ohio 2008); In re Welch*, 347 B.R. 247 (Bankr. WD. Mich. 2006); *In re Reeves*, 327 B.R. 436 (Bankr. W.D. Mo. 2005); *In re Attanasio*, 218 B.R. 180 (Bankr. N.D. Ala. 1998); *In re Bicsak*, 207 B.R. 657 (Bankr. W.D. Mo. 1997); *In re Haffner*, 198 B.R. 646 (Bankr. D. R.I. 1996); *In re Dempton*, 182 B.R. 38 (Bankr. W.D. Mo. 1995); *In re Messenger*, 178 B.R. 145 (Bankr. N.D. Ohio. 1995); *In re Smith*, 157 B.R. 348 (Bankr. N.D. Ohio 1993); *In re Wilkson*, 168 B.R. 626 (Bankr. N.D. Ohio 1994); *In re Berndt*, 127 B.R. 222 (Bankr. D. N.D. 1991); *In re Strong*, 84 B.R. 541 (Bankr. N.D. Ind. 1988).
Many of these cases rely on cases reaching the same conclusion in the context of a 11 U.S.C. § 1325(b)(2) analysis of whether a debtor has committed all of his or her disposable income to a Chapter 13 plan. *See, e.g., In re Bottelberghe*, 253 B.R. 256, 261 (Bankr. D. Minn. 2000); *In re McNichols*, 249 B.R. 160, 169-170 (Bankr. N.D. Ill. 2000); *In re Ehret*, 238 B.R. 85, 88 (Bankr. D N.J. 1999); *In re Bottorff*, 232 B.R. 171, 262 (Bankr. WD. Mo. 1999);*In re Carter*, 205 B.R. 733, 735-36 (Bankr. 205 B.R. 733); *In re Cardillo*, 170 B.R. 490, 492 (Bankr. D. N.H. 1994); *In re Schnabel*, 153 B.R. 809, 818 (Bankr. N.D. Ill. 1993); *In re Belt*, 106 B.R. 553, 561-62 (Bankr. N.D. Ind. 1989); *In re Saunders,*60 B.R. 187, 187-88 (Bankr. N.D. Ohio 1986); *In re Kern*, 40 B.R. 26, 28-29 (Bankr. S.D. N.Y. 1984); *In re Sellers*, 33 B.R. 854, 857 (Bankr. D. Colo. 1983);

[13] *In re Reeves,*327 B.R. at 442.

found that the result in *Reeves* would be the same under either.[14] That is not the case here. If the Debtor and Mr. Boatright's income and reasonable expenses are simply pooled, dismissal is warranted under § 707(b)(3). If the Court considers the realities of the situation, however, dismissal is not warranted.

After weighing the arguments for and against each approach, the Court concludes that a case-by-case analysis better advances the goals of § 707(b)(3).

### 1. The pooling approach.

Few courts that advocate a "pooling" approach have looked past the presumption that "*most married couples live as a unit, pooling their income and expenses*"[15] and that "some portion of [the non-debtor's income] is *likely* to be applied to household expenses, thereby affecting the share of the debtor's income required for support."[16] Most simply conclude, without discussion, that a non-debtor spouse's income must be considered in determinations of abuse (or analogous determinations under § 1325(b)(2)).[17] Three arguments advanced for pooling a debtor's and a non-debtor's income are: 1) it avoids difficult evidentiary issues;[18] 2) it prevents abuse by conniving couples;[19] and 3) it prevents a debtor and the non-debtor spouse from unduly burdening the debtor's creditors with the costs of the couple's or the non-debtor spouse's lifestyle.[20]

The Court is not persuaded by any of these arguments.

---

[14] *Id.*

[15] *Id.* at 441 (citing *In re Carter*, 205 B.R. at 736).

[16] *Id.* (citing *In re Bottelberghe*, 253 B.R. at 262, and *In re Carter*, 205 B.R. at 736).

[17] *See, e.g.*, *In re Bicsak*, 207 B.R. at 659; *In re Dempton*, 182 B.R. at 40; *In re Cadillo*, 170 B.R. at 492; *In re Smith*, 157 B.R. at 350.

[18] *See In re Welch*, 347 B.R. at 254.

[19] *See In re Reeves*, 327 B.R. at 442 (citing *In re McNichols*, 249 B.R. at 171).

[20] *See In re Kern*, 40 B.R. at 28-29.

First, the Court believes that the evidentiary difficulties are overstated.[21] Courts are already charged with evaluating similar exclusions of a non-debtor's income on Line 17 of Form B22C. And to the extent that the evidentiary concerns are valid, the Court is amenable to an approach based on a presumption that a debtor benefits from the entirety of a non-debtor spouse's income, which presumption can then be rebutted with specific evidence of the amount and basis for excluding income that is "NOT paid on a regular basis for the household expenses of the debtor or the debtor's dependents" – the precise way in which Form B22A handles the issue. As a practical matter, the Court does not need to decide whether such a presumption is necessary because here the Debtor has offered sufficient evidence to rebut any such presumption.

Second, it is unlikely that disregarding the portion of a non-debtor's income that is not devoted to household expenses will lead to an abuse of Chapter 7 by calculating debtors or non-debtors. Though possible, it is unlikely that a married couple would have the foresight to structure their finances in such a way that one spouse incurs all of the debt while the other spouse spends (lavishly) on the household. It is also unlikely that such a case would avoid detection and prosecution by the office of the UST, which has proven itself eminently capable of ferreting out abusive cases.

Third, the Court is not persuaded that granting a debtor a discharge of her debts, which may include debts incurred for the benefit of a non-debtor, places an undue burden on creditors. If a creditor extended credit to a debtor individually, then it cannot reasonably rely on the assets of the non-debtor for repayment. Inversely, if the creditor extended credit jointly to the debtor and non-debtor, then a discharge of the debtor will not affect the creditor's ability to seek repayment from the non-debtor. In this case, the evidence suggests that the debts the Debtor seeks to discharge are her individual debts. To the extent they are joint debts of the Debtor and Mr. Boatright, a discharge in the Debtor's case will not affect those creditors' ability to pursue Mr. Boatright for repayment.

**2.    The case-by-case approach.**

---

[21] Moreover, the Court notes that pooling a debtor's and non-debtor's income without consideration of the actual circumstances would raise more questions than it answers and would likely create more evidentiary burdens than it solves. For example, if a couple isn't married, should a court pool the debtor's income with the income of a non-debtor "significant other"? Should a court impute an income to a non-debtor spouse who has the ability but not the motivation to work? If so, how much?

The best argument in favor of a case-by-case approach to measuring the impact a non-debtor's income has on a determination of abuse under § 707(b)(3) – in addition to that it doesn't suffer from any of the weaknesses of the pooling approach – is that it mirrors the approach Congress approved for use in the § 707(b)(2) context, and the Court finds no statutory, precedential, or practical basis for abandoning it. Section 707(b)(3) directs the Court to consider the "totality of circumstances . . . of the debtor's financial condition," and examining the actual amounts a non-debtor regularly contributes for the household expenses of a debtor and her dependents on a case-by-case basis accomplishes this better than the pooling approach. There is no mandatory precedent requiring the Court to adopt the pooling approach. And, from a practical perspective, while the figures used in the case-by-case approach may differ slightly from those used in the § 707(b)(2) context, in that under § 707(b)(3) a court is not limited to a consideration of CMI and standardized expenses, the methodology is the same: a debtor's income is increased by the amount a non-debtor spouse regularly contributes for the household expenses of the debtor and the debtor's dependents. In terms of measuring a debtor's ability to repay creditors, the impact of a non-debtor spouse's income can be expressed by deducting from a debtor's income only those expenses she actually pays. To measure the impact of Mr. Boatright's income on the Debtor's ability to repay her creditors, the Court deducted from the Debtor's actual monthly net income only those expenses listed on Schedule J that the Debtor actually pays. Where the evidence established that Mr. Boatright paid an expense, it was eliminated. Where the evidence showed that the Debtor paid an expense, it was left as is. And if the Court had any question as to who paid a particular expense, the Court assumed that Mr. Boatright paid half of that expense (to give the UST the benefit of any doubt). In concrete terms, the Court calculates the Debtor's actual expenses as follows:

| **DESCRIPTION** | **CLAIMED** | **ADJUSTED** | **RESPONSIBILITY** |
|---|---|---|---|
| Mortgage | 1,272.38 | 0 | Mr. Boatright |
| Utility - Elect. | 255.00 | 0 | Mr. Boatright |
| Utility - Water | 47.00 | 0 | Mr. Boatright |
| Utility - Telephone | 60.00 | 0 | Mr. Boatright |
| Utility - Gas | 88.67 | 0 | Mr. Boatright |
| Utility - Cable | 59.00 | 0 | Mr. Boatright |

| | | | |
|---|---|---|---|
| Home Maintenance | 75.00 | 32.50 | ½ Debtor |
| Food | 750.00 | 750.00 | Debtor |
| Clothing | 200.00 | 200.00 | Debtor |
| Laundry | 25.00 | 25.00 | Debtor |
| Medical | 175.00 | 175.00 | Debtor |
| Transportation | 500.00 | 500.00 | Debtor |
| Recreation | 100.00 | 50.00 | ½ Debtor |
| Life Insurance | 120.00 | 60.00 | ½ Debtor |
| Auto Insurance | 63.58 | 63.58 | Debtor |
| Husb. Car | 1,059.26 | 0 | Mr. Boatright |
| Husb. Motorcycle | 195.80 | 0 | Mr. Boatright |
| Husb. Credit Card | 1,310.00 | 0 | Mr. Boatright |
| Misc. Household | 150.00 | 75.00 | ½ Debtor |
| **Total Expenses** | 6,505.69 | 1,931.08 | |

As this chart shows, based on the evidence adduced at trial, the Debtor is responsible for only $1,931.08 in expenses; the rest are paid by Mr. Boatright. Subtracting this figure from the Debtor's actual monthly net income of $1,939.34[22] yields a monthly surplus of only $8.26. Therefore, the Court finds that the Debtor does not have the ability to a substantial amount of her unsecured debt, and dismissal of this case is not warranted under § 707(b)(3).

---

[22] The UST actually estimates that the Debtor's income is actually slightly lower ($1,823.19), which would increase her monthly deficit.

## CONCLUSION

The Court recognizes that its ruling could be construed as condoning what appears on the surface to be a manipulation of the Bankruptcy Code by Aaron and Lorie Boatright. It would be easy to condemn Mr. Boatright's choice to pursue a costly long-shot rap music business while he ignores the needs of his family and compels his wife to support the household on a meager salary that he controls. It would be easy to condemn him for refusing to pay his wife's credit card bills – particularly when most of the charges were apparently for necessary household expenses – and forcing her into bankruptcy.[23] As objectionable as his behavior is, however, the Court must be mindful that the conduct of a non-debtor, no matter how obnoxious, cannot serve as the basis for denying a debtor her discharge, as long as the debtor is not conspiring with the non-debtor or benefitting from his conduct. The Court is convinced that Lorie Boatright is doing neither. The evidence and the demeanor of the Boatrights showed clearly, even painfully, that Lorie Boatright has little or no say in the way the Boatrights handle their household finances. And Lorie Boatright is certainly not benefitting from her husband's conduct; to the contrary, the Court sympathizes with Lorie Boatright's plight and wishes her the strength and good fortune to change her circumstances.

Therefore, for the reasons stated above, the Court finds that dismissal of this case is not warranted under 11 U.S.C. § 707(b)(2) or (b)(3). A separate Order will be entered in accordance with Bankruptcy Rule 9021.

Entered this 2nd day of September 2009.

/s/ Jerry W. Venters
HONORABLE JERRY W. VENTERS
UNITED STATES BANKRUPTCY JUDGE

Copies to:
Kevin E. Checkett
Sherri L. Wattenbarger

---

[23] Mr. Boatright admitted that he had refused to pay his wife's credit card debts as "punishment" for past problems with credit card debts. It appeared from the testimony that the Boatrights had refinanced their home mortgage debt once and perhaps twice to pay credit card debts. Mr. Boatright said that he opposed Lorie Boatright's bankruptcy filing, and that he would have preferred to let her creditors sue her and attempt to collect their judgments by way of garnishment.